AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



**F I L E D**
CLERK, U.S. DISTRICT COURT

06/29/22

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ nne _____ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

6/29/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CD___ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Eric Schmidt,<br><br>Defendant | Case No.   5:22-mj-00411-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 24, 2021 in the county of San Bernardino in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Joseph Weidenkopf*
_____
*Complainant's signature*

Joseph Weidenkopf, Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 29, 2022
_____
*Judge's signature*

City and state:   Los Angeles, California      Hon. Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Brittney M. Harris (x0488)

## <u>AFFIDAVIT</u>

I, Joseph Weidenkopf, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1. This affidavit is made in support of a criminal complaint against Eric SCHMIDT ("SCHMIDT") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi) (possession with intent to distribute fentanyl); and for warrants to search the following: (1) 14728 Nanticoke Road, in Apple Valley, California (the "SUBJECT PREMISES"), as described more fully in Attachment A-1; (2) 1988 Chevy pickup truck registered to SCHMIDT, bearing California license plate number 44596J1 and VIN 1GCDC14K2JZ329886 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-2; and (3) the person of Eric SCHMIDT, as described more fully in Attachment A-3.

2. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 21 U.S.C. § 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of a communication facility, including the mail, to facilitate the distribution of a controlled substance), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of drug trafficking crimes) (the "Subject Offenses"), as described more fully in Attachments B. Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from my review of law enforcement reports, law enforcement database searches and other postal information, various law enforcement personnel, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND FOR POSTAL INSPECTOR JOSEPH WEIDENKOPF</u>

4.     I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since August 2015.  I have completed a twelve-week basic training course in Potomac, Maryland, which included training in the investigation of drug trafficking via the United States Mail.  I am currently assigned to the USPIS Los Angeles Division, Contraband Interdiction and Investigations team.  For three years, I was previously assigned to the Parcel Task Force, which was comprised of Postal Inspectors and narcotics officers and detectives from the Los Angeles Police Department's ("LAPD") Gang and Narcotics Division.  The Parcel Task Force was responsible for investigating drugs trafficked in parcels, including via the United States mails.  I spent one year as a Task Force Agent with the Drug Enforcement Administration's ("DEA") Enforcement Group 2 in the Los Angeles Field Division.

I completed a forty-hour specialized USPIS narcotics training
course and a forty-hour LAPD narcotics school training course.
I have instructed at the LAPD narcotics school on multiple
occasions.

5.    Before becoming a Postal Inspector, I was employed as
a Special Investigator retained by the United States Office of
Personnel Management for seven and a half years, where I
conducted civil service and national security investigations.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    The USPIS and other law enforcement agencies are
investigating a large-scale fentanyl-trafficking organization
("DTO") that is mailing drug parcels from California to other
states, including New York, and is believed to be headed by drug
suppliers based in Sonora, Mexico.

7.    This investigation began when a person in Santa Ana
alerted law enforcement about a parcel that he/she received, but
that did not belong to her/him, and contained suspected drugs.
When law enforcement seized the parcel, they determined it
contained fentanyl pills and fentanyl powder.  The USPIS
launched an investigation into this parcel and found that
Mexico-based IP addresses had been tracking it.  One of the
Mexico-based IP addresses that was tracking that parcel was also
tracking another parcel that law enforcement also seized on
September 13, 2021 pursuant to a federal search warrant.  The
parcel contained a white box, which contained a brick-shaped
item enclosed inside of multiple layers of packaging.  There
were multiple fingerprints belonging to Eric SCHMIDT on the

inside packaging layers of the parcel, and a forensic laboratory determined that the brick-shaped item was over a kilogram of fentanyl.

8.    SCHMIDT resides at the SUBJECT PREMISES and the SUBJECT VEHICLE is registered to him.  During surveillance at the SUBJECT PREMISES on June 17, 2022, as described in further below, law enforcement observed the SUBJECT VEHICLE in the driveway and activity consistent with it being a drug stash location.

## IV. STATEMENT OF PROBABLE CAUSE[1]

### A.    Background

9.    On June 8, 2021, Orange County Sheriff's Department ("OCSD") was called by a resident, L.L., who lives in Santa Ana, California.  L.L. reported that he/she received a parcel that was delivered to his/her front door, as L.L.'s address was listed as the sender/return address for the parcel, but that L.L. did not mail the parcel.

10.   OCSD identified the parcel as a USPS Priority Mail Parcel bearing tracking number 9505 5150 6987 1144 7862 50 ("Fentanyl Parcel 1").  The parcel was addressed to "Wilisha Jones 2417 May St Cincinnati oh."  The sender/return address was listed as "Denise Jones 2045 Greenleaf St Santa ana CA 92706," which is L.L.'s home address.  Both sender and recipient addresses were handwritten on the package.

11.   For several days, L.L. held the parcel and tried to identify the intended sender or recipient.  Upon opening

---

[1] All dates are on or about and all times are approximate.

Fentanyl Parcel 1, L.L. alerted OCSD that the contents may be drugs, and after examining the contents, OCSD then contacted USPS.

12.  Fentanyl Parcel 1 contained two separately wrapped bundles in black packaging and several layers of plastic, covered in a red greasy substance.  Inside one of those packages were thousands of small blue pills; inside the other was grayish white pressed powder.  The DEA laboratory tested the pills and powder.  DEA laboratory testing revealed that the parcel contained approximately 1004 grams of powdered fentanyl, and 4,988 fentanyl pills, weighing approximately 520.4 grams.

13.  Upon reviewing USPS records, I learned that Fentanyl Parcel 1 was mailed on May 24, 2021, at 5:32 p.m., at the Santa Ana Window Services Post Office, located at 3101 West Sunflower Avenue, in Santa Ana, California.  I attempted to retrieve video of the mailer from the Santa Ana Window Services Post Office, but the video recorded on the surveillance system had expired.

14.  Based on USPS records, I learned that there were six IP address in Sinaloa and Sonora, Mexico that tracked Fentanyl Parcel 1.  One of the Mexico IP addresses, IP address 200.68.180.18, tracked Fentanyl Parcel 1 on June 1, 2021, from the state of Sonora in Mexico to California ("IP Address 1").  Based on my training and experience, I know that Sonora and Sinaloa, Mexico are major drug sourcing locations.  Specifically, methamphetamine and fentanyl are often manufactured there and transported to the United States for further distribution.

**B.    Seized Parcel Contains Fentanyl, Identification of Eric SCHMIDT**

15.    Through USPS records searches, I found that on September 8, 2021, IP Address 1 was also tracking another parcel: a USPS Priority Mail parcel, bearing tracking number 9505 5141 0130 1236 5202 81, which was later seized from the USPS in Llano, California ("Fentanyl Parcel 2").  Fentanyl Parcel 2 weighed approximately 4 pounds and 13.5 ounces.  It had the following sender/return address "Deni Richards 36756 165th St. E Llano, Ca. 93544", and it bore a handwritten label addressed to "YOVANY Cruz 1717 UNiVERSity AVE. BRONX, NY. 10453."

16.    Fentanyl Parcel 2 was postmarked on August 24, 2021 from a United States Post Office in Apple Valley, California. Between August 24, 2021, and September 11, 2021, Fentanyl Parcel 2 was in the mail stream and moved between California and New York without delivery due to an unknown recipient name at the recipient address.

17.    On September 11, 2021, Fentanyl Parcel 2 was "returned to sender."  Because the sender address does not exist (as confirmed by the Llano Post Office), the package arrived and sat at the Llano Post Office, located at 17234 Pearblossom Highway, in Llano, California.

18.    On September 13, 2021, I intercepted Fentanyl Parcel 2 in the mail stream at the Llano Post Office for further investigation.  Fentanyl Parcel 2 was a large USPS Priority Mail box.  I researched the sender name and address, and the

recipient name and address for Fentanyl Parcel 2 in the CLEAR database.  The CLEAR searches did not show the listed sender name of "Deni Richards" associated with the listed sender address or the listed recipient name of "YOVANY Cruz" associated with the listed recipient address.

19.  Fentanyl Parcel 2 possessed characteristics shared with the Fentanyl Parcel 1 and common to those that contain contraband, specifically:

        a.   Fentanyl Parcel 2 was mailed using Priority Mail service with no business account number;

        b.   Fentanyl Parcel 2's sender and recipient information were handwritten;

        c.   Fentanyl Parcel 2 was mailed from a Post Office in a different city than the return address – namely, from Apple Valley, California, but the sender address was in Llano, California;

        d.   Fentanyl Parcel 2 had a sender address that did not exist — namely, the Llano Post Office confirmed that the sender address was not a real mailing address and did not exist.

        e.   Fentanyl Parcel 2 could not be delivered at the recipient address because the recipient was unknown at that location.

20.  On September 20, 2021, the Honorable Patricia A. Donahue, United States Magistrate Judge for the Central District of California, issued a search warrant for Fentanyl Parcel 2, in case number 2:21-MJ-4375.

21.   On September 21, 2021, OCSD Investigators LeFlore and
Estes, and I opened Fentanyl Parcel 2 (a large USPS Priority
Mail box) pursuant to the search warrant.  Inside of Fentanyl
Parcel 2 was a medium USPS Priority Mail box. Inside of the
medium USPS Priority Mail box was a blue and white bubble
mailer, which was taped closed with clear tape.  Inside of the
bubble mailer was a brick-shaped item that was wrapped with
several layers of packaging and other items.  From the outside
going inward, the brick was wrapped with the following: foil,
clear vacuum bag, green plastic wrap, plastic vacuum bag, coffee
grounds, dryer sheet, four layers of plastic vacuum bags, yellow
tape, clear plastic, and a kilo-shaped brick of a white powdery
substance that weighed approximately 1213 gross grams.

22.   Based on my training and experience, large-scale drug
manufacturers package drugs in kilogram quantities that are
brick-shaped.  Each "brick" contains approximately one kilogram
of a controlled substance.

23.   The USPIS laboratory tested the brick and determined
that it was approximatley 1008.2 grams of fentanyl.  I reviewed
surveillance video of Fentanyl Parcel 2's mailer, but I have not
identified the mailer.

24.   A USPIS forensic laboratory determined that Eric
SCHMIDT's fingerprints were on several parts of the parcel.  To
note, the laboratory only tested the medium USPS Priority Mail
box, the blue and white bubble mailer, and the outermost clear

vacuumed sealed bag.[2] The forensic laboratory found the
following: (1) seven fingerprints belonging to SCHMIDT on the
adhesive side of the clear tape that was used to seal the medium
USPS Priority Mail box, which itself was inside of a large USPS
Priority Mail box; (3) three fingerprints belonging to SCHMIDT
on the adhesive side of the clear tape that was used to close
the blue and white bubble mailer; and (3) five of SCHMIDT's
fingerprints on the vacuum-sealed plastic bag.

25.   Based on my training and experience and the locations
of the fingerprints, I believe that SCHMIDT packaged the
fentanyl brick inside of the parcel.

**C.   Internet Protocol Address Investigation Led to a Stash House in Compton**

26.   Based on USPS records searches, I learned that another
Sonora, Mexico IP address was also tracking Fentanyl Parcel 2:
IP address 189.173.179.237 ("IP Address 2").   IP Address 2 was
also tracking other parcels around the same time.   Further
investigation into those parcels led to the identification of
Anthony Frausto, Juan Gonzalez, and a stash location in Compton,
California.   Law enforcement encountered heavy
countersurveillance during surveillance operations between
October 2021 and February 2022, including an incident in
February 2022 where a vehicle drove head-on with a DEA
undercover vehicle and continued to advance bumper-to-bumper
with the undercover vehicle as the undercover vehicle was
reversing down the street attempting to avoid a collision and

---

[2] Due to safety concerns regarding fentanyl, the laboratory
will not test further layers.

exiting the neighborhood.  A federal search warrant was executed at the stash house on February 24, 2022 and law enforcement found over 65 kilograms of fentanyl, 17 kilograms of methampehtamine, and four firearms.  Based on my training and experience and discussions with DEA agents, I believe the combined wholesale value of the drugs found is approximately $1,500,000, with a street value of approximately $5,000,000. Juan Gonzalez was indicted on March 11, 2022, in Case No. CR 22-00085-SB, which is pending.[3]

D.   **SCHMIDT's Criminal History**

27.   On February 9, 2022, I obtained reports of SCHMIDT's criminal history.  He has the following drug-related convictions:

▪   Possession of a controlled substance (felony), in violation of California Health and Safety Code § 11377(A), on or about December 30, 1997;

▪   Possession of a controlled substance (misdemeanor), in violation of California Health and Safety Code § 11377(A), on or about March 16, 1998;

▪   Possession of a controlled substance (felony), in violation of California Health and Safety Code § 11377(A), on or about January 7, 2000;

▪   Possession of controlled substance paraphernalia (misdemeanor), in violation of California Health and Safety Code § 11364, on or about September 16, 2005; and

---

[3] Anthony Frausto died in January 2022 of a suspected drug overdose.

■   Possession of a controlled substance (felony), in violation of California Health and Safety Code § 11377(A), on or about July 9, 2012, which was set aside and he was placed in a drug treatment program.

**E.   Investigation of SCHMIDT's Residence, the SUBJECT PREMISES, and the SUBJECT VEHICLE**

28.  On February 9, 2022, I obtained a photocopy of SCHMIDT's California driver's license with a color photograph of SCHMIDT.  The driver's license reflects SCHMIDT's home address as the SUBJECT PREMISES.  Based on a Google Maps search, the SUBJECT PREMISES is located approximately 2.3 miles away from the Apple Valley Post Office, which is where Fentanyl Parcel 2 was mailed from.

29.  On June 17, 2022, officers with the Chino Police Department, including USPIS Task Force Officer ("TFO") Zachary Sumpter, and I conducted surveillance at the SUBJECT PREMISES. The SUBJECT PREMISES is located in the desert and there are limited locations for law enforcement to perform surveillance due to the remote nature of the location, few vehicles if any parked on the streets, and limited foliage or structures to provide cover or concealment.  I know the following information from my own observations, from speaking with TFO Sumpter, who was parked nearest the SUBJECT PREMISES, and from reading surveillance notes from TFO Sumpter:

■   A 1988 Chevy Silverado, California license plate 44596J1 registered to SCHMIDT, was parked in the driveway (the SUBJECT VEHICLE);

▪ About 12:26 p.m., a heavy-set white female exited the front door of the SUBJECT PREMISES and entered the driver seat of a white Chevy Silverado, registered to Victorina Beltran or Kelly Sahagun, parked in the driveway. The female subject drove the vehicle out onto the street and parked it in front of the SUBJECT PREMISES facing southbound;

▪ About 12:26 p.m., the garage door opened, and a white male adult resembling SCHMIDT walked out onto the driveway;

▪ About 12:50 p.m., a vehicle with a Utah license plate and registered to an address in Utah pulled in front of the SUBJECT PREMISES.  The vehicle slowly began driving southbound and negotiated a u-turn.  The vehicle proceeded northbound and drove away.  SCHMIDT walked down the driveway and began trying to flag down the vehicle.  The vehicle turned back around and parked in the SUBJECT PREMISES' driveway.  Four people exited the vehicle empty handed.  SCHMIDT spent several hours performing maintenance on the vehicle's front tires in the driveway.

▪ About 12:56 p.m., a gray sedan registered to an address in Apple Valley arrived and pulled in front of the white Chevy parked in front of the SUBJECT PREMISES;

▪ About 1:03 p.m., an adult female exited the garage with a purse and large black duffle bag around her shoulder.  The gray sedan drove in front of the SUBJECT PREMISES and stopped in the middle of the street.  The female with the

duffle bag entered the front passenger seat and the vehicle left at a high rate of speed.

▪ Shortly before 3:00 p.m., a white Kia SUV drove directly next to one of the surveillance officers, who was parked several blocks away from the SUBJECT PREMISES. The Kia's driver rolled down the window and drove slowly past the officer. The Kia drove past the SUBJECT PREMISES and drove into an empty dirt lot that I was parked in several blocks away. The Kia drove slowly and very close to my driver's side door, backed up and drove by me, and drove up again with the driver's side window down while holding up a small unknown silver coin. As the Kia was about to drive out of the lot, it stopped and backed up towards my vehicle again. The Kia parked about 20 feet behind my vehicle and a white adult male driver exited the Kia and began yelling at me with a piece of paper in his hand. I was unable to hear him or read the piece of paper. As I began to drive away from the driver, he held up the piece of paper while lifting up the front of his shirt exposing his front waste band.[4] I pulled away from the lot and left the area and the Kia drove back towards the direction of the SUBJECT PREMISES.

▪ The Kia appeared to be a lookout and was spotting team members in undercover vehicles. The white Kia parked in

_____

[4] Based on my training and experience, law enforcement procedure when making a felony arrest, for example during a felony traffic stop, is to ask the suspect to pull up their shirt to expose their waste band. This allows law enforcement to observe whether or not the suspect is carrying a concealed firearm in the waste band area, which is a common place for suspects to carry firearms. I believe the driver was showing me his waste band to indicate he did not have a firearm in his front waste band in an attempt to lure me closer.

front of 14769 Nanticoke Road, Apple Valley, California, which
is across the street and two houses down from the SUBJECT
PREMISES.

> ▪   About 3:02 p.m., a silver car parked at the
SUBJECT PREMISES and a female exited the vehicle.  The
surveillance team terminated surveillance and was leaving the
area after being confronted by the white male, so no further
information was gathered.

30.  Based on my training and experience, knowledge of this
investigation, and the activity at the SUBJECT PREMISES,
including the observation of the woman leaving with a large
duffle bag, I believe that the SUBJECT PREMISES is a drug stash
location and that SCHMIDT is a drug distributor.  Based on the
location of fingerprints inside Fentanyl Parcel 2, I believe
SCHMIDT packages fentanyl for distribution at the SUBJECT
PREMISES.  Given my investigation so far, I believe it is
probable that there is evidence of the Subject Offenses inside
the SUBJECT PREMISES, in the SUBJECT VEHICLE, and/or on
SCHMIDT's person, which might include records, digital devices,
packaging material, drug proceeds and controlled substances,
etc.

31.  I further believe that any more attempts by law
enforcement to conduct surveillance at or near the SUBJECT
PREMISES will result in alerting SCHMIDT and co-conspirators to
law enforcement presence, will likely lead to confrontation with
countersurveillance personnel and will place law enforcement and
other bystanders in the neighborhood at risk if a confrontation

took place, as drug distributors and co-conspirators often possess weapons to protect themselves and the drug stash.

**F.   Request for Night Service**

32.   This drug trafficking organization is involved in firearms possession and drug trafficking.  As set forth above, it is probable that the SUBJECT PREMISES is a drug stash house location and law enforcement encountered dangerous levels of countersurveillance.  Moreover, law enforcement officers surveilling other residences involved in this investigation have encountered heavy countersurveillance, including at the drug stash location in Compton, California, wherein millions of dollars' worth of drugs was found along with four firearms were seized.  Thus, for the safety of the law enforcement officers involved in executing the requested search warrants, I am requesting night service authorization.

**V.   Training and Experience on Drug Offenses**

33.   Based on my training and experience, including my familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

▪   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

▪ Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their homes, cars, garages, and storage units.

▪ Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones or other digital devices, of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

▪ Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

▪ Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

▪ Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, garage, car, and storage units, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

▪ Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, and at their homes, cars, garages, and storage units.

▪ It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

▪ Drug traffickers, especially those who store large quantities of drugs inside of a stash location, often possess firearms and ammunition for protection.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[5]

32.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

33.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

34.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

        b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

        c.    Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress Eric SCHMIDT's thumb and/or fingers on
the device(s); and (2) hold the device(s) in front of Eric
SCHMIDT's face with his or her eyes open to activate the facial-
, iris-, and/or retina-recognition feature.

    34.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. <u>CONCLUSION</u>

    35.  For all of the reasons described above, there is
probable cause to believe that Eric SCHMIDT has committed a
violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi): Possession
with Intent to Distribute a Controlled Substance, on August 24,
2021.  There is also probable cause that the items to be seized

described in Attachment B will be found in a search of the
SUBJECT PREMISES described in Attachment A-1, the SUBJECT
VEHICLE described in Attachment A-2, and Eric SCHMIDT's person,
as described in Attachment A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 29th day of June
2022.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE